MEEHAN *vs.* ROURKE.

*In the matter of proving the last Will and Testament of* ELIZABETH MACDONALD, *deceased.*

WHEN a subscribing witness made her mark, opposite her name written by the other witness, and she "acknowledged it to be her mark and signature," *Held,* that the mode of attestation was a sufficient compliance with the statute requiring the witness to "*sign* his name."

A witness who has written the testator's name, at his request, must *write* his own name; but other witnesses may *sign* their names, either by writing or by placing a mark opposite to the name when written by another.

A will contested on the ground of testamentary incapacity, admitted to proof.

T. J. GLOVER, *for Executors.*

H. C. BANKS, *for Next of Kin.*

I. The will is improperly attested. Witnesses must "*sign their names.*" *Stat.* 29, *Ch.* II., requires testator to sign, and witnesses to "attest and subscribe." In *Harrison* vs. *Harrison,* 8 *Vesey,* 185, and referred to in 8 *Adolphus & Ellis,* 94, the Chancellor decided *a mark* a good attestation, because the "*the word sign did not apply to witness.*" The case in 5 *Johnson,* p. 144, was attested by initials. Jarman regards it, even under the English statute, at least improper, in the advanced state of education. (1 *Jarman,* 73.)

II. The language of the *Statute* 29, *Ch.* II., has been adopted in many States *verbatim,* as it has been on some points in this State; but on the attestation of wills, it directly departs. If the intention of the framers of the

25

law must govern, when the law is not explicit, what are we to infer from the variance?

III. A mark cannot be proven. (4 *Randolph*, 325. 4 *Yates*, 346. 1 *Haywood*, 19. *Cowen's Notes on Ph. Ev.*, 1306.). Therefore, if both were marksmen, and no witnesses to prove the fact of a mark being made, the death or absence of the witnesses would leave the will without attestation.

IV. The mark, or the fact of its having been made, cannot be proven by the associate witness; because it would subvert the intent of the statute, which provides two witnesses, to *guard from fraud*, and the whole execution would depend on the proof of one witness.

V. If the witness can prove the attestation of his associate by mark, other circumstances should afford *incontestable proof*, and the witness should be *beyond suspicion*; *vide* conflict of testimony, and antedate and interlineation of will in handwriting of Duggan.

VI. It is not proven according to statute, that the decedent requested the witnesses to sign or attest. The publication of a will must be *unequivocal*. (*Rutherford* vs. *Rutherford*, 1st *Denio*, 33.)

VII. The absence of Eliza Green is not proven, nor are proper efforts to procure her shown. All the cases cited in *Cowen's Notes*, *Ph. Ev.*, 1294, require more diligence than is here shown; and he says, "If the absence appears to be the result of collusion, secondary proof will not be admitted." The evident fraud in this case proves collusion.

VIII. The statute requiring that he who writes the testator's name, shall sign his own as a witness argues that

it is contemplated the witnesses' names shall be written, and is simply declaratory as to the fact as to who shall be a witness.

IX. The evident torpidity of the mental faculties requires a lucid relapse to be clearly shown by undoubted evidence (*Vid. Opinion, Case of Catherine Kerr—Bradford, Surrogate.*) "The evidence to establish the fact should be of the clearest character."

X. Typhus fever in the stages preceding death, incapacitates the mind. (1 *Beck's Med. Jur.*, 10*th ed.*, *p.* 821.)

THE SURROGATE. The decedent was a widow woman, between fifty and sixty years of age, and died on Thursday, February 5th, 1852, at the house of Mrs. Swift, where she had been boarding for nearly two years. Her disease was typhus fever, with which she was attacked eight or ten days before her decease. The will disposed of her property as follows:—To her sister Susan, $700; to Mrs. Swift, the wife of a cousin, $200, in addition to $200 acknowledged to be due to her; to Catherine Hagan, a second cousin, $150; Mary Hagan, $50; Arthur Hagan, $100; Bridget Hagan, $30; Patrick Minor, a friend, $50, and to Anne, his daughter, $100; Rose Corcoran, a relative, $100; Anne Rourke, a niece, $100; and the Rev. Thomas Farrell, $100.

The will was drawn by Dr. Duggan, the decedent's medical attendant. He states that she requested him at a previous visit, the evening before or that morning, to draw a will for her; he could not then stay, but promised to call again. "Accordingly," he says, "at my next visit I drew it, and it was executed. I can't say whether it was Monday or Tuesday, or what day of the week it was." Dr. Duggan also testifies that the will was executed the

day it bears date, February 2nd, 1852. He says the decedent dictated the entire instrument; showed where her papers were; gave Mrs. Swift the keys of the drawer to get them out; told him every place where the different sums of money mentioned in the will were deposited; and spoke so as to make him understand every word she said, though, from her tongue being parched and dry, her utterance was not so distinct as usual. After it was written, the will was read aloud to the decedent, in the presence of Eliza Green, and was then executed. He also declares in the broadest terms, that her mind was sound during the whole course of her sickness, from the first to the last visit, and that she was never in a stupor till the day she died.

The Rev. Thomas Farrell, a legatee under the will to the extent of $100,—but who, on releasing his legacy, was admitted as a competent witness,—states that he attended the decedent, six or seven times, during her sickness; that he was present at her residence when her will was being prepared, and, understanding a legacy of $100 was to be given to him, went into the decedent's room and remonstrated with her. She told him not to trouble himself about it, and that she had made up her mind for some time to leave him something. She said that quite distinctly. The doctor then came in to draw the will, and Mr. Farrell heard her tell him what she had to leave, and where it was deposited. He says, "I think it was some kind of railroad stock. I also recollect she spoke something of money she had then in her drawer, and requested somebody to look for it and get it. Search was made, and they could not find it for some time. However, by her directions, and pointing out more minutely where it was, they got it. I also heard her say she had as much money as would pay her funeral expenses, independent of what she mentioned in her will. I heard her mention the various persons to whom she was leaving something in her will.

She gave all these directions herself, with her own lips. I remember, she mentioned Mrs. Swift as a legatee for a certain amount. I think Mrs. Swift, if not remonstrating, at least told her to consider the matter well. Dr. Duggan was writing the will, in her bedroom, while she was giving these instructions. I left before the will was executed, at least I think I did."

Catherine Leonard, who lived in the same house with Mrs. Macdonald, states that she saw her the Monday before she died, and she talked sensibly. This was between 8 and 9 A. M., and she left because the doctor and clergyman came. The next day the witness thought she could not speak so plainly. On the preceding Sunday, she testifies that she found her sitting in a rocking-chair, dressed.

Daniel Riley testifies, that on the Sunday preceding her decease, he called to see Mrs. Macdonald, and found her sitting in a rocking-chair, in her sitting-room, whilst her bed was being made for her. He had some conversation with her; and while he was there, her attendants took her under the arms and put her to bed. He communicated the fact of her sickness to Thomas Rourke about half past seven o'clock Monday morning, when he came to the shop where they worked together. Thomas Rourke, he says, got ready, and went up immediately.

Thomas Rourke states that he went to the house between nine and ten, and staid about an hour. He says she could not speak very plainly. She asked him how his wife and his sister's children were. "She said, Margaret and the children, how are they? . . She said this in a broken manner, could hardly say two syllables together; she could not." Rourke thought he went there again that evening, and recollected that he called the next morning. He testified that on Tuesday morning she tried to speak, but was unable. He could not understand anything she said, or tried to say.

On the side of the contestants, Anne Rourke, the niece

of the decedent, states that she first saw her during her last sickness, on Monday; that she was then speechless, and hardly recognized her. This was about eleven or twelve o'clock, and she stayed there about two hours. She called again the next day, between twelve and one, and remained till her aunt's death.

Mr. Harrison visited her on business, he says, on Monday between twelve and two. He asked her several questions, and found her unable to speak. He came again the next day, not far from noon, spoke to her and got no reply, though she made an effort to speak.

Peter Blake testified that on the 29th of August last, he met Dr. Duggan in the street, and said, " Doctor, you never told me my cousin, Mrs. Macdonald, was sick." He adds, " I asked him if he understood about Mrs. Macdonald's will; and he said it was no good at all, that she was out of her mind before he saw her."

The will bears date, February 2, 1852; but as the date is written at the head and at the foot of the will, in such a way as to show manifestly that it was added after the rest of the instrument was written, that circumstance might seem suspicious. But Dr. Duggan says positively, it was written at the time of the execution. If the will was executed on Monday, the day it bears date, the evidence shows the decedent had testamentary capacity. She was able to sit up on Sunday night, and Thomas Rourke swears she spoke to him, Monday morning.

The will was made about noon; and yet, if made on Tuesday, how is this possible when Harrison swears he was there at that time, and the doctor came in while he was there; and Anne Rourke testifies that as she came on Tuesday the doctor was going out? So, likewise, if Anne was there on Monday between eleven and twelve, how was it she saw neither the doctor, nor the priest, nor the will? Now, Anne makes two visits: she states certain circumstances, which occurred at the second, among which is a visit made

by Mrs. Van Zandt, a lady with whom Mrs. Macdonald formerly lived. This, she says, took place Tuesday afternoon. Mrs. Van Zandt proves it was Wednesday afternoon. I think, therefore, that Anne made her first visit on Tuesday, and her second on Wednesday. Again, Mr. Harrison thinks his first visit was on Monday, for the reason that he paid off all hands on Monday, and his wife sent Anne to look for a girl that day; and yet, on reflection, he states that he only paid Thomas Rourke on Monday, because he had not been there on Saturday. Thomas Rourke testifies that on Tuesday Mrs. Swift sent him for the priest, to come and make the will, as the doctor was to be there at 12 o'clock. The Rev. Mr. Farrell, however, declares that he knew nothing about a will till he arrived at the house.

. Anne Rourke is the daughter of the contestant: Thomas Rourke and Mrs. Harrison are half-brother and half-sister of the contestant. They may be mistaken as to *time*, but there can be no mistake in respect to the testimony of the physician and the clergyman: the facts they swear to are minutely stated, and, if true, show that the paper propounded is the last will of the deceased, made and dictated by her. If they are untrue, it is not a mistake about a date or a day, but it is wilful perjury. The case is still more complicated in consequence of the absence of Eliza Green, one of the subscribing witnesses to the will, and a niece of Mrs. Swift, a legatee—and of the statement of Peter Blake, who says the doctor told him the decedent had lost her mind before he saw her. This the doctor denies; and as it is evident the fact was otherwise, it is very extraordinary that he should tell Blake an untruth, in order to destroy a will he himself drew and witnessed.

I confess much embarrassment in finding a clue to guide me to a solution of these conflicting statements. I must suppose mistakes as to dates and conversations, on the one hand, or, on the other, find two respectable men, having no apparent interest in the transaction, guilty of corrupt

swearing. I cannot say'there is sufficient evidence to force the latter conclusion upon my mind, and have therefore determined to admit the will to probate, if the formalities of execution were properly performed. In arriving at this result I have not overlooked the medical testimony, to the effect, that typhus-fever is generally accompanied with stupor and mental disturbance. But the decedent appears to have been very lightly attacked at first.—She could sit up and converse on Sunday, she recognised and spoke with Thomas Rourke on Monday, and, as testified to by the doctor and clergyman, gave particular instructions when the will was made. This evidence establishes the fact of competency, and shows either an exception to the medical rule, or a mistake as to the type of the disease at that stage.

Eliza Green, one of the witnesses, attested the will by making a mark. The doctor wrote her name; she made her mark, he guiding the pen; and then she acknowledged it to be "her mark and signature." Before the Revised Statutes, a witness might attest a will by mark. The statute of 1 *Vic.*, *c.* 26, requires the witnesses to "attest" and "subscribe" the will; and this, it has been decided, may be done by signature or mark, but the witness must, in either case, partake in the physical act of subscribing. Our statute requires the witness to "*sign* his name;" and where a witness has subscribed the testator's name by his direction, he is required to "*write* his own name as a witness to the will." The variance in the phraseology is not unimportant. A witness who has written the testator's name, must *write* his own. He has shown he can write. Other witnesses may "*sign* their names." Where another person writes the name of the witness and then the witness acknowledges the signature—puts his mark to it, his *signum*—he literally *signs ;* and what he signs is his name— *i. e.* he signs his name—while a mark alone would not be sufficient. I think the requisition of the statute sufficiently

complied with, by the name of the witness being written at the end of the will, and the witness putting his mark thereto. This construction meets the design of the Legislature, in having the name of the witness, and excluding wills attested only by marks; and does not shut out the attestation of wills by illiterate persons, when a penman can be found to record the transaction. I should come to any other conclusion with regret, as otherwise I should be compelled very frequently to reject wills attested by marksmen, the experience of this office showing that mode of execution to be very common. But, aside from the consequences, I do not think the rule contended for justified by the language of the statute, or consistent with the distinction made between a witness *writing* his name, when he has subscribed the testator's name, and being required in all other cases, only to " *sign* his name." There must, then, be a decree declaring the will in this case duly proved.