## SHERWOOD vs. JUDD.

*In the matter of the Estate of* DAVID F. SHERWOOD, *deceased.*

THE intestate was born in Connecticut, and after attaining full age, pursued the calling of a mariner, generally sailing from and returning to the port of New York, and then visiting his native place. Having married in this city, and become master and owner of a vessel, and, until his decease, making this his principal place of abode and business, when not at sea,—*Held*, notwithstanding he made occasional visits to his place of birth, that New York was his domicil at the time of his death, and that the distribution of his estate was governed by the laws of New York.

A domicil can be gained only by residence *animo manendi*. When a domicil is once gained it is not lost until another is acquired. But little stress should be laid upon casual declarations as opposed to actions and course of conduct. The residence of the family is an important circumstance in determining the abode of the head of the family. The domicil of origin is not of much consequence except in determining the balance in a doubtful case.

In questions of domicil the leading inquiry is as to the person's general habit of life, the centre of his business interests his occupations and his home affections.

After a cause has advanced to the examination of witnesses, a party litigant will not in general be permitted to renounce contestation, assign his interest, and become a witness.

EBENEZER SEELY, *for the Intestate's Father.*

The intestate was born in 1817, or about that time, in Connecticut. At about the age of fifteen, he commenced going to sea from a neighboring port. After arriving at age, it would seem he was never in Connecticut, except as a visitor among his friends. He soon became a master and then an owner of vessels, sailing uniformly from the port of New York, and returning to the same place. He married in New York, rented a house here, kept house for several years, all his business was done here, his friends knew of his having no other place of residence. After his wife's death he always rented a room so as to have a home, and kept his room and paid rent for it equally whether he was at sea or in port.

He visited his friends at Danbury, Bridgeport, and Fairfield, from time to time; but, both he and his wife disliked Connecticut, and declared they would never live there. One witness represents him as spending the whole year of 1851, in Connecticut; but even she says he was visiting in different places all the time, whereas the other witnesses represent him as living all that time in this city, and only making short excursions into the country.

His letters, bank account, checks, charter parties, on inspection, appear to have such dates, that while on land, down to the day of his death, he was in this city, transacting business, both during his wife's life and after her death; and his absences were so short into the country, that his friends here did not miss him.

After keeping house here for several years, he went to New Orleans, and, being sick, sent for his wife; they were absent about two years or more, and on their return boarded at Mrs. Nestelle's about eighteen months; from Mrs. Nestelle's they went to Mrs. Baker's, about eight months; shortly after that, his wife was lost returning after a short voyage to Savannah, January 3, 1851.

He went to Mrs. Harris' again, and talked of getting married, and buying him a house in this city. Mrs. Harris advised him to do so. From there he went to Lisbon, and on his return took rooms at Mrs. Brewster's, which he kept, whether in port or at sea, till his death.

While living at Mrs. Brewster's, he bought the barque Cuba, and went to Aspinwall. The oath which he took on the registry of that vessel, is strong evidence of his domicil. The act of Congress is stringent. (1 *U. S. Statutes at large*, 288, 289.) He is required by that act to swear to his place of abode, whether he is sole owner, and if not sole owner, who are the other part owners, their names, and their places of residence, and in case any matter of fact required to be sworn to, shall not be true, the vessel is thereby forfeited.

In connection with this evidence, it is material to bear in mind that the tax collector of Fairfield examined his lists for

twelve years back, and did not find Sherwood's name. By the statute of Connecticut (*Ed.* 1849, *p.* 603, *sec.* 9,) " The polls of all the white male persons between twenty-one and seventy years of age, shall be set in the list at ten dollars each," &c. It is notorious that no man, arriving at the age of twenty-one in a Connecticut town, escapes having his poll set in the list.

There is really no conflict in the evidence in this case. Every word alleged by Mrs. Beers and some others to have been spoken by him as to his having no home but Connecticut or his home being on the sea, is quite consistent with a New York domicil, while similar declarations that his home was in this city, and he would not for any consideration live in Connecticut, are more satisfactorily proved; but such declarations, either way, are of little weight, compared with the facts proved in this case, utterly inconsistent with his having a domicil in any other place than New York.

The whole of this law is brought into a small compass in *Story's Conflict of Laws*, *sec.* 41, 42, 43, 44, 45, 46, and 47. See also, 1 *Burge's Com.*, 36, 40, 42; *Whicker* vs. *Hume*, 5 *Eng. Law & Eq. R.*, 52.

W. LYONS, *for Intestate's Brothers and Sisters.*

I. The brothers and sisters claim that David F. Sherwood, deceased, was born in Fairfield, Connecticut, in the year 1816; and that he first left his father's house in the year 1834: that he sailed from Southport to New York in a market-boat, as a common sailor—sailing summers and remaining home winters, until the year 1841, as shown by the evidence of Mrs. Beers, and also by the evidence of Isaac Beers, of Fairfield, which corroborates that of Mrs. Beers.

II. The evidence of all the witnesses on both sides shows, that from the time he commenced going on the water till his death, he was a sailor by profession, and always followed

this business; that the time he spent in New York was while he was preparing for sea; and that as a general thing, he always went to Connecticut when he returned from a voyage. The general rule laid down in the case of *Crawford* vs. *Wilson*, 4 *Barbour Rep.* 522, applies in this case, viz. : that sailors while following their business or profession do not lose their original domicil—they may be legal residents of one place, although they may have been absent therefrom for years.

III. David F. Sherwood was married in 1844, and soon after his marriage he left for sea, remaining away nearly two years; and as soon as he returned from sea, he went to Connecticut. The fact that his wife remained in Monroe-street for a short time, does not change the residence of the husband—it being a general rule, that the wife takes the domicil of the husband at marriage. Her residence in New York was temporary, and for a particular purpose; which appears from the fact, that as soon as his business rendered it necessary for him to remain in New Orleans, she went to live with him there, leaving the house in the possession of her mother, Mrs. Martin, the furniture remaining the same, and the other boarders still remaining with her, as testified to by Mrs. Fitzgerald, a witness called on the part of the father, showing that she was only a boarder, and did not own the furniture or keep house there.

IV. After his marriage, his wife was with him on the water, as appears from the evidence of Mrs. Brewster and Mrs. Beers. His absence from Connecticut was of a temporary nature, and for a particular purpose, as shown by the testimony of Sarah Hubbell, Mrs. Beers, and also by his letter directed to his father, where he says distinctly, that it was his intention to come to Connecticut and settle down. All of the witnesses for the father testify, that he often said that it was his intention to leave the water and settle down; and not one of them heard him say, that he thought of making New York his home.

V. That he never did consider New York his home, appears from the statement made by Captain Sherwood to Mr. Lyon, in the spring of 1851, and also from the evidence of Nathan Godfrey, who says: that Capt. Sherwood told him, that he remained home in Connecticut at one time two or three months, and that his friends wished him to stay longer, but his business prevented. Capt. Godfrey also swears, that he was always on the water when he could be; and that he did not stay in port any more than absolutely necessary to prepare for sea. Mrs. Parker also said that Capt. Sherwood told her, that he should have left the sea before and settled in Connecticut, if it had not been for his wife : that during the summer of 1851, when he had nothing to do, he came to Connecticut, and when he had business in connection with his ship, he went to New York. Angeline Sherwood also states, that when the deceased was away from Connecticut, he was at sea.

VI. The registry oath cannot be admitted in evidence—it not having been proved that David F. Sherwood ever signed the paper, or that the Deputy Collector Clinch, had power to administer an oath.

VII. A mere naked residence in New York for a time, while he was preparing for sea, is not sufficient to change his domicil from Connecticut. His domicil may have been in Connecticut, and his actual residence in New York. (19 *Wendell*, 11.) The fact of his having been taken to Connecticut to be buried, points towards that State as his place of residence. With these considerations the case is respectfully submitted.

OWEN & VOSE, *for Administrator.*

THE SURROGATE.—David F. Sherwood having died intestate, a question has arisen as to his residence at the time of his decease, his brothers and sisters alleging that he was domiciled in

the State of Connecticut, and his father, that he was domiciled in the State of New York. The point is of consequence, as determining the law of distribution. The intestate was born at Fairfield, Connecticut, in 1816. Before attaining full age, he was in the habit for several years of sailing as a mariner from Southport, on short coasting voyages, returning frequently to his father's residence. He subsequently went to sea, generally sailing from and returning to the port of New York, and then visiting his native place. In the fall of 1844, he married in the city of New York, and resided with his wife and mother-in-law, at No. 26 Monroe-street: he afterwards got to be master and owner of a vessel, was absent at the south a very considerable period of time during the Mexican war, and ultimately returned to New York. In 1851, his wife was lost at sea, on a voyage from Savannah—he came back to New York, boarded in East Broadway over a year, and finally after another voyage or two, he died at this place. These facts indicate generally a domicil at New York. The prominent witness to establish a residence in Connecticut, is Mrs. Eunice Beers, a sister of the intestate. Together with her husband, she was a party litigant in the present proceeding, but after the cause had advanced to the examination of witnesses, they assigned their interest. I do not think that parties can renounce a contestation, and be admitted as witnesses after they have become liable for costs. But still taking her evidence as competent, it is contradicted in its most important features. She says, that her brother after his return from New Orleans in 1849, came with his wife to her house at Fairfield, and that they remained there during the year 1850, except when making visits elsewhere, until the month of November. She also testifies, that on his return from the voyage upon which his wife was lost, he came to her house in February, 1851, "and staid through the year 1851, in Connecticut, principally visiting about." These statements would place his most usual abode for two years in that State. On the other hand, Mrs. Harris testifies, that the decedent came to board with her at No. 80 East Broadway, in January

1851, and remained about thirteen months ; he went to Connecticut a number of times for two or three days, or a week, but did not give up his room. Mrs. Brewster states, that she let the decedent a sleeping apartment in February, 1851, at her house in Great Jones-street, and subsequently in Grand-street and Clinton-street—he furnished his room, and kept it till he died, though he did not take his meals there till May, 1852. She says, that he was absent in Connecticut in 1851, several weeks ; that he remained at home a year before going to sea, and after his return from his last voyage died at her house. Mr. Maddox, a room-mate with the decedent at Mrs. Harris', the summer and fall of 1851, says, that he was several times absent about two or three weeks. To go back to the year 1850, Mrs. Pease, an acquaintance of Mrs. Sherwood from childhood, testifies, that after their return from New Orleans in 1849, Sherwood and his wife boarded at Mrs. Nestelle's in East Broadway, about two years, and with Mrs. Baker in Henry-street, six or eight weeks, during which period Mrs. Sherwood visited Connecticut several times, the witness on one occasion accompanying her. Mrs. Parker states, that on their return from New Orleans, the decedent and his wife made a visit to Connecticut of about three months, and then boarded at Mrs. Nestelle's eighteen months, and at Mrs. Baker's six or eight weeks. This evidence seems to me entirely decisive against a domicil in Connecticut during this period ; and yet this is the strongest part of the case of the brothers and sisters. There is not the beginning of proof that the time he spent there, whether long or short, was *animo manendi*, with the intention of permanently remaining. His presence there had none of the characteristics of a fixed abode ; he was visiting about from one place to another, and all the while had apartments in New York.

Without going back more remotely, I think it clear that the decedent was domiciled in New York at the time of his marriage in 1844. He marries here, and keeps house. It was sought to escape the force of this fact, by endeavoring to make it appear that the house was kept by his mother-in-law ;

but she was a poor woman, without the means of supporting the establishment; and the witness Godfrey says distinctly, that Sherwood told him he had purchased new furniture, and hired the whole house. Sherwood's name was on the door-plate, and his wife continued to live there a year or two, though most of that time he was absent at sea. His absence at the South up to 1849, was not with the intention of changing his residence; and circumstances indicate that subsequently, on his return to New York, he had conceived the idea of buying a farm and settling down in Connecticut. This was probably in his mind when visiting at Fairfield with his wife, but in consequence of her expressed dislike of the project, as I should judge, it came to nothing. Mr. Godfrey says, that *he* also expressed a great aversion to living in Connecticut. I place little stress however on declarations of this character as against a man's actions and course of conduct. There are many statements of that kind, and some to quite the contrary effect, throughout the case, but they are not entitled to much consideration. Casual remarks in the course of conversation must weigh but little against facts.

New York was the decedent's place of business for many years—he signed all his papers as of New York—his vessels were registered here—he sailed from and returned to this port—he married here, kept house and left his wife here, when going abroad. It is said the residence of the wife cannot affect the question, because the domicil of the wife follows that of the husband; without controverting that legal doctrine, it is manifest that the residence of the family is an important element in determining the abode of the head of the family. The wife is usually placed at home. If not accompanying her husband abroad, her residence is ordinarily the point to which he expects to return, and which he esteems his place of permanent domicil. There is another fact, which, in a nicely balanced case, would be decisive. In 1852, the decedent became owner of the bark Cuba, and declared under oath at the Custom House that his "present place of abode or residence" was New York. This sworn statement standing

alone would carry great force, but when it is in harmony with the other features of the case, its effect is quite conclusive. An effort was made to prove the decedent had paid a poll tax as a resident of Connecticut, but it failed, at least as to any period within twelve years before his death. The deed of land in Connecticut, which was introduced describing him as of Fairfield, does not appear to have been recorded at his request, and the date of the instrument was in 1840, some four years before his marriage. It is true, Connecticut was his domicil of origin, but that circumstance is of very little consequence, save in a doubtful case, (1 *Burge's Com.*, 36, & see *Bruce* vs. *Bruce*, 2 *Bos. & Pull.* 230,) while on the other hand it sheds light upon the nature of his visits there, and explains their motive. It was natural enough, after an absence of months and years, that he should favor his relations with even protracted visits. But we should regard the probable motive of the act, in order to judge of its character, and certainly we cannot put our finger on any one of these visits and say that it was made with the intention of acquiring or resuming a residence, nor as to all of them put together can we find proof of a continuing purpose of claiming or keeping a domicil at the place of his birth—as against the *indicia* of a permanent abode which attach to the New York residence. Was he a resident of Connecticut, when living with his wife in Munroe street—or when boarding with her in East Broadway more than a year, after their return from New Orleans—or when boarding after her decease with Mrs. Harris for twelve or fifteen months—or in 1852, when declaring under oath that his residence was in New York.

I think his domicil here as well established as was consistent with the nature of his calling. He had no family except his wife, and his living at lodgings after the decease of his mother-in-law does not detract from the permanence of his abode. (*Whicker* vs. *Hume*, 5 *Eng. Law & Eq. R.*, 52.) That he remained here only while preparing for sea is not sustained by the proof, though if it had been the case, it would have been nothing extraordinary for an industrious

sailing master. What was this man's general habit of life? That is always the great and leading inquiry in questions of domicil. While on land, where were his business interests centered, where did his occupations fix him and his necessities call him—what was the point of his home affections? As between Sherwood's short and occasional visits to Connecticut and the continued character of his abode in New York, whether at housekeeping or boarding, married or unmarried—as between the entire absence of interest in property or business there, and the presence of all his interests here—could it be said without violence to every fair and natural inference to be drawn from the habits and pursuits of mankind, that his purpose, his objects and his employments here were temporary, and that there was a fixed intention of a settled habitation at Fairfield? I concede the principle that sailors while following their avocation, do not necessarily change their domicil; but it is true, nevertheless, that sailors may change their domicil, and, as, if they mind their business, they have but little time to spend on land, we are limited perforce to a narrow sphere of observation or field of deduction. But even within that small compass we may discover a few facts that would be controlling. If a sailor marries, supports his wife, and invariably returns to her when on land, that circumstance alone would go far to make her place of residence his own home and abode. But there is a wide difference between a mariner shipping from one port or another, and equally at home in any, without a single tie to attach him— and the master of a vessel, a man of substance, having his business always centered in one spot, from which he is absent only for a temporary purpose, to which he constantly returns, where he marries and lives with his wife, where he describes his residence in a sworn official document, and where he dies. The home of the former is about as unstable and floating as the element on which he earns his livelihood, that of the latter as determined, constant, and settled as the nature of his pursuits admits. As to the former, we may be compelled to resort to the domicil of origin in default of finding any other,

as to the latter, there can be no difficulty in discovering his usual abode and habitation. I have no hesitation in the present instance, in determining that the decedent's domicil was at the time of his death, as well as antecedently, in the city of New York, and distribution must accordingly be decreed according to the statutes of this State.