WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SUR-
ROGATE.—June, 1883.

WHELPLEY v. LODER.

*In the matter of the probate of the last will and testament
of EVA J. BANKS, deceased.*

The fact that one is named as executor, in an instrument propounded by
    another as the will of a decedent, does not render him a party to the
    proceedings; and he is, therefore, not disqualified, *as a party,* by Code
    Civ. Pro., § 829, from testifying as to transactions or communications
    between himself and the latter.

Even where one so named as executor is the proponent of the alleged will,
    he is, in his capacity of executor, a party *without interest,* and, there-
    fore, not included in the prohibition of that section, because it is im-
    possible that he should be examined "in his own behalf or interest;"
    besides, contestants, against whom he would testify, are not persons
    deriving their "title or interest from, through or under" the deceased,
    by assignment or otherwise.

A release, by a legatee, to the executor, of his interest as such, removes all
    objections to his competency, on the ground of interest, as a witness in
    proceedings for probate of the will.

The attorney of a decedent, called, in proceedings for the probate of the
    latter's will, by the executor proponent, to prove the instructions re-
    ceived by witness for drawing the same, may testify with respect

thereto, notwithstanding the prohibition of Code Civ. Pro., § 835, as to disclosing communications made by his client in the course of his professional employment, because by calling him the objection is waived by the personal representative, to whom alone the privilege of objecting survives.

Such testimony is, moreover, admissible on a broader ground, namely, that the statute is designed to protect the living in their business relations, and not to conceal the intentions of decedents, in respect to the disposition of their estates.

For a like reason, Code Civ. Pro., § 834, cannot be regarded as forbidding a physician to disclose, in proceedings to prove his patient's will, information acquired in professional attendance, upon an issue as to testamentary capacity.

The value of the testimony of attending physicians, as to their patients' testamentary capacity, and that of alienists, upon the same subject, given in response to hypothetical questions,—compared.

Decedent was 82 years old, and somewhat shaken in mind and body by her advanced age, at the time of the making of her alleged will, which was drawn by her attorney, and named him as an executor and a legatee. The execution was formally proved, without evidence of any conversation or conduct, attending it, furnishing any clue to her mental capacity.—

*Held*, that this at once suggested suspicion and the necessity of a careful scrutiny into the facts.

In order to justify the rejection of a will of a person of sound mind, on the ground of undue influence, contestant must show facts inconsistent with the hypothesis of the execution having been procured by any other means.

There is no rule of law prohibiting the draftsman of a will from taking a legacy thereunder.

We are all experts in handwriting, differing only in degree of skill.

Under Code Civ. Pro., § 2558, subd. 3, permitting the Surrogate to award costs to an unsuccessful contestant of a will, where he "is named as an executor in a paper propounded by him in good faith as the last will of the decedent," such a contestant, so propounding, cannot have costs where he is an attorney and acts as his own counsel.

Allen v. Pub. Administrator, 1 *Bradf.*, 221—approved.

THE testatrix died in Westchester County, in 1882, in the eighty-sixth year of her age, leaving an alleged will, dated May 15th, 1877. She was the widow of William Banks, who died several years before her. She had had one child, a son, who died in 1877, leaving no children.

At the time of the making of the will of 1877, the only heirs-at-law and next of kin of the decedent were Louisa M. Hoyt her sister, and Louisa M. Craft and William M. Whelpley, children of Daniel Whelpley a deceased brother. She had, in 1874, executed a will, by which she bequeathed to her son the use of certain bank stock which, at his death, was to be sold, and the proceeds divided among various legatees. The legacies amounted to $12,-200, of which $5,000 was given to Benjamin G. Hitchings, and $2,100 to Henry D. Loder, who were the executors; $3,100 to the members of the Loder family; $600 to persons by the name of Babbitt, $400 to William B. Finch and wife, $700 to Seraphine Vredenburgh, and $200 to Ann Marshall and Phebe Pierce jointly, all strangers to her blood. The residue was given, in three equal parts, to Sarah A. Loder, Henriette L. Bicker and the daughter of Daniel Whelpley.

The provisions of the will of 1877 were as follows: She gave $1,000 to Mr. Hitchings, $1,000 to Henry D. Loder (having given him $1,000 in cash, since the will of 1874), $3,200 to other members of the Loder family, $2,000 to Wm. B. Finch, $1,300 to the Babbitt family, $200 to Hattie Valentine, $700 to Seraphine Vredenburgh, $200 to Ann Marshall and Phebe Pierce jointly, $800 to Henriette L. Bicker, and $200 to Sarah E. Mosher—in all, $10,600, and the residue to Sarah A. and Charlotte A. Loder, wife and daughter of Cyrus W. Loder. She declared that she had already given her sister, Louisa M. Hoyt, $6,000, and therefore gave her nothing by the will.

She had also made a will in 1865, by which she gave a legacy of $5,000 to Mr. Hitchings, and of which he was named an executor. He was an attorney, and had been

her counsel, but had nothing to do with the drawing of any of the wills, and was in no way related to her. In the will of 1874, he was also, with Henry D. Loder, named as executor, while in the will of 1877, Mr. Hitchings, Cyrus W. Loder and Henry D. Loder were named as the executors. Henry D. Loder, who was then the counsel of the decedent, drew the will of 1874, and, still acting in the same capacity, that of 1877, by which he was bequeathed a legacy of $1,000. Cyrus W. Loder alone propounded it for probate.

The Whelpleys contested the will of 1877, chiefly on the ground of fraud, undue influence and a lack of testamentary capacity, while Mr. Hitchings, as an executor of the will of 1874, contested it upon like grounds, and propounded the will of 1874 for probate. Mrs. Hoyt, one of the next of kin, took no part in the controversy.

After the witnesses to the will had given their testimony, to show its due execution, other testimony was given by the contestants, by which it was sought to show want of testamentary capacity. The proponent then offered Henry D. Loder as a witness, to prove the instructions which he received for drawing the will of 1877, which were written, and claimed to be in the handwriting of the deceased, and also to prove other transactions and communications with the deceased. The evidence was objected to, and the objection sustained. Subsequently, a written release of the legacy to him was executed by him and filed, and he was again called to prove what had been before offered. It was again objected that the release did not render the witness competent; that as an attorney he was forbidden by statute to testify to any communications made to him by his client. The testimony

was however, taken subject to the objection, which was to be determined on the consideration of the whole case. The proponent also offered the testimony of the physicians who had attended decedent at different times prior and subsequent to the execution of the will of 1877, with a view of establishing testamentary capacity. This was objected to, on the same ground, but was received in like manner. The testimony of Cyrus W. Loder, the proponent, as well as that of some of the legatees, was offered in support of the will and taken subject to objection.

FRANK B. COLTON, *for proponent.*

FRANKENHEIMER & ROSENBLATT, *for Whelpleys, next of kin.*

BENJAMIN G. HITCHINGS, *in person.*

THE SURROGATE.—Considering the amount involved, which does not, I think, exceed $18,000, this has been one of the most protracted, and sharply and ably contested cases which it has fallen to my lot to witness. The questions as to the admissibility of certain evidence, lying as they do at the threshold of, and in a large measure dominating, the case, have been elaborately considered and presented by counsel. I think no case bearing upon these questions has escaped their vigilance. I have endeavored to deduce from them such rule for this case, and for future guidance in like cases, as the authorities cited and the ends of justice seem to warrant.

The will of 1877 was prepared for an old lady of eighty-two years, somewhat shaken in mind and body by her advanced age, by her attorney, who is a legatee named therein, and also an executor. The execution of it is formally proved, with no evidence of conversation or con-

duct, attending it, furnishing any clue to the mental capacity of the testatrix. This at once suggests suspicion, and the necessity of a careful scrutiny into the matter. Doubtless, impressed with this aspect of the case, the proponent procured the release of the legacy by Henry D. Loder, and then offered his evidence. It will be seen, therefore, that three questions at once arise, on offering this witness: 1st, being named as executor in the will, was he a party, who is excluded from. testifying by § 829 of the Code; 2d, if competent as executor, but incompetent by reason of the legacy, could he release it so as to render him competent; 3d, was he rendered incompetent by § 835 of the Code, which declares that an attorney shall not be permitted to disclose the communications made to him by a client.

As to the *first* point; if Henry D. Loder, as executor simply, had propounded the will, he would have been competent to testify as to its execution (Children's Aid Society v. Loveridge, *70 N. Y., 387*). The section has not been so changed since that case arose, as to materially affect the question; hence his testimony as to the *factum* must stand; but he was not a proponent, nor is he in any way a party to the record.

As to the *second* question,—did his release render him competent generally? At common law a person who, not a party, had any pecuniary interest in the result of an action, could assign, or release such interest, and thus be rendered competent. I know of no statute changing this rule, except that § 829 will not permit an *assignor* to testify, in certain cases, in favor of an assignee. Here the legatee releases the estate to the executor, etc. He does not release to the residuary legatees, nor assign to them.

The effect may be to send his legacy to his relatives, but they cannot, therefore, be regarded as his assignees, or as persons taking under him. Surrogate BRADFORD held, in Meehan v. Rourke (*2 Bradf., 385*), that a legatee, on releasing his legacy, became a competent witness; but he also held, in Sherwood v. Judd (*3 Bradf., 267*), that a party to the record, after the case had been partly tried, would not, in general, on assigning his interest to become a witness, be received as such, and thus relieve himself from liability for costs. In Reeve v. Crosby (*3 Redf., 74*), Surrogate CALVIN held that a release, given by a lawyer who drew the will, of a legacy to him, and who was named as executor therein, rendered him competent to testify to the execution of it. It did not seem necessary in that case to go further, and determine whether it rendered him generally competent. In Burritt v. Silliman (*13 N. Y., 93*), the executor renounced as such. He did not propound the will for probate; held, a competent witness. The case arose in 1850, before parties were permitted to testify. In Coffin v. Coffin (*23 N. Y., 9*), an executor, who was one of the proponents and a legatee, renounced as executor and released his legacy, and became a witness generally in the case, no objection being made. On the whole, I have no doubt that the release removed all objections to his competency on the ground of interest.

As to the *third* question,—could he, as the attorney of the deceased, be permitted to testify under § 835, the contestants objecting. It is true that the courts have long held that, the client being dead, the right to object survives to his representative. Were that not so settled,—were it now open, I should be inclined to hold that the act, being in derogation of the common law, must be strictly fol-

lowed, and that the right to object died with the client.
But, as the decisions stand, the representative, and no one
else, may raise the objection.    Here, however, the execu-
tor is the representative. JACOB, in his Law Dic. (*title*
" *Representation*"), says an executor represents the per-
son of the testator.    In Schoonmaker v. Wolford (*20 Hun*,
*166*), the court says, the executor's official character hav-
ing been sufficiently established by the formal proof of
the will, he must be regarded as the personal representa-
tive of the deceased, and as such, competent to waive the
statutory exclusion of both the physicians and the attor-
ney.    Hence, Cyrus W. Loder was the only party compe-
tent to raise or to waive the question, and he expressly
waived it by calling the attorney to testify.

   But I think the testimony is admissible on a broader
ground than any depending upon the construction of the
statute (the provision in the R. S. and that in the Code
being almost identical).    WHARTON, in his Law of Evi-
dence, § 591, says: " The privilege, it should be remem-
bered, is meant to protect the living in their business re-
lations, and cannot be invoked when the question arises
as to the intention of a deceased person, in respect to the
disposition of his estate."    This doctrine is quoted ap-
provingly in the case of Staunton v. Parker (*19 Hun, 55*).
The same reasoning will apply as to the admissibility of
the testimony of attending physicians.    Surrogate BRAD-
FORD, as long ago as 1850, held, in the case of Allen v.
Public Administrator (*1 Bradf., 221*), that the statute
prohibiting physicians to testify was not applicable to
probate proceedings, on the ground that there was no
one competent to assert the privilege in exclusion of the
testimony.    I cannot find that this *dictum* has ever been

distinctly disapproved. In many prominent cases the rule has been adopted without question, eminently in the celebrated Parish Will case. There, attending physicians were examined very fully, and without a suggestion of a doubt, by the very eminent counsel engaged, as to their competency. In the recent case of the Matter of Chapman (*27 Hun, 573* [decided in 1882]), the court held that the attorney was not privileged from testifying for the contestants, under the objection of the executor, as to facts and communications with the deceased, where fraud or mistake is alleged.

I feel myself constrained, therefore, to receive and consider the evidence of Henry D. Loder as properly given in the case, and to overrule the objections taken thereto by the contestants. It follows that the evidence of the attending physicians must also be regarded as competent, and the same disposition is made of the objections interposed to it. The cases of Edington v. Mut. Life Ins. Co. (*67 N. Y., 185*); Same v. Ætna Life Ins. Co. (*77 id., 564*); Grattan v. Met. Life Ins. Co. (*80 id., 281*); Bacon v. Frisbee (*id., 394*); Root v. Wright (*84 id., 72*); Dilleber v. Home Life Ins. Co. (*87 id., 79*), cited by contestants, I do not regard as in point, none of them relating to a probate proceeding, and, in all of them, the objection being taken by the representative of the deceased. The case of Brush v. Holland (*3 Bradf., 240*), decided in 1855, also cited by contestants, to show that executors propounding a will are parties to a probate proceeding, may be conceded without, as I conceive, in any way affecting this case. We come now to the question of the admissibility of the evidence of Cyrus W. Loder, executor, and the proponent of the will of 1877.

It has been repeatedly decided that a mere executor propounding a will is not a party in interest; that his prospective commissions do not have that effect, not even where he is bequeathed a legacy in payment of his services to be rendered.   He cannot, therefore, be regarded, under § 829, as a party examined in his own behalf or interest, against a person deriving his title or interest from, through, or under a deceased person, by assignment or otherwise.   I think the word "behalf" is here used in the sense of "advantage" or "profit," and that Cyrus W. Loder is a party without interest, through whom, by the law, others seek their interests; nor do I think the contestants are persons "deriving their title or interest" from the deceased, by assignment or otherwise, within the meaning of the section.   The execution of the will had been proved when he was called, and the contestants were seeking to establish an interest in the estate, by its rejection.   But I regard the case of the Childrens' Aid Society v. Loveridge (supra), citing with approbation Dieterich's Estate (1 Tucker, 129), not only as settling the question as to him, but also as to Henry D. Loder, on this point, by determining the competency of an executor to testify not only in regard to the execution of the will but also as to other transactions and communications with the deceased.   I, therefore, overrule the objection made, and receive the evidence.   I have looked into the numerous authorities on these points, to which I have been referred by contestants, but find nothing to alter the conclusions reached.

Without here giving any special consideration to the question of the competency of the Babbitt legatees, to testify to transactions and communications with the de-

ceased, I shall disregard so much of it as may be fairly regarded as covered by such an objection. But the testimony of Louisa M. Hoyt, the sister of the deceased, whose interest, if any, is antagonistic to the will, and who was called by the proponent, was clearly competent.

Having disposed of these questions, I propose to consider next that of undue influence or fraud, and, in that connection, the condition of mind and disposition of the deceased, as rendering her a fit subject for their exercise. In doing this, I do not propose to go largely into the facts, which are spread over some fifteen hundred pages of testimony, nor to state at any length the rules of law established to guide and govern those who have occasion to pass along the well-beaten track, I will only refer to what Lord CRANWORTH says, in Boyse v. Rossborough (*6 H. L. Cas., 2*). "In order to set aside the will of a person of sound mind, it is not sufficient to show that the circumstances attending the execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis." As a preliminary to such consideration, it becomes necessary to determine whether the paper called "mem. of my will," is the work of the testatrix herself, for if it be, it becomes an important element in the solution of these problems, as well as of that of her testamentary capacity hereafter to be briefly considered. Considerable testimony of experts was taken in regard to the genuineness of the document, one expert declaring it to be wholly simulated, including the signature, and another pronouncing it to be wholly genuine. We are all, in certain degrees, experts on handwriting, and I have never yet found it safe to subordinate my own

judgment to that of an expert. The paper bears upon its face evidence to satisfy me that it was the work of the deceased herself, and this is fortified by testimony showing that she was engaged in her room writing her will, and shortly afterward sent for Henry D. Loder, and personally delivered the paper to him, with a request that he would formulate it as her will. This paper is of very great consequence, as tending to free Henry D. Loder, as her legal adviser, legatee and executor, from the suspicion of having wielded an influence naturally springing from his relation to her. His testimony satisfies the condition required in Drake's Appeal (*1 Amer. Probate Rep.*, *227*). He drew a will for her in 1874, submitting it to Mr. Hitchings before execution, which was strikingly like this, in that it failed to provide for any of her next of kin except the Whelpleys, and placed even them among the very last of the recipients of her bounty, and gave the bulk of her property, after the death of her son, to nearly the same persons to whom she bequeathed it by the will of 1877. By the former will, Mr. Hitchings' legacy was $5,000, while by the latter it is reduced to $1,000. This reduction is explained in a note to him, found among her papers after her death, in which she states that the larger sum had been given in the expectation that he would watch over her son's welfare, and that, he being dead, that expectation had ceased to exist. The bequest to Henry D. Loder was reduced from $2,100 in the former, to $1,000 in the latter, she having given him in cash, in the interval, $1,000, thus adeeming the larger amount to that extent. By the prior will she bequeathed sums aggregating $12,200, and by the latter, $10,600; the chief difference between the two aggregates being the

amount of the reduction of H. D. Loder's legacy. There can be no just ground, under these circumstances, for coming to the conclusion that he fraudulently procured this will to be made. She, for aught that appears, acted entirely of her free will; he wished her to employ some other counsel to draw the will, which she declined to do; his legacy, as compared with that of the prior will, is reduced in amount; it bears no remarkable disproportion to the amount of the estate; nor to the amounts of the legacies to others standing in a somewhat similar relation to the deceased. There is no rule of law which would prevent him from taking a legacy under a will because he drew it. The testimony of the attorney, and other circumstances, and especially the fact that, some weeks afterward, she communicated the substance of the will to Cyrus W. Loder, furnish that preponderance of evidence which destroys any ground of suspicion suggested by the facts that he was her confidential adviser, and was made a legatee and an executor. I have given my best consideration to the subject, and fail to find anything which induces me to give any great weight, as against the justness of the transaction, to anything attending the preparation of the will. As to any other evidence of fraud, or undue influence practiced upon the deceased, I find absolutely none. That the Loders were kind to her, that they humored her, that they visited her and were attentive to her, is to their credit. Because they conducted themselves in this manner toward an old lady, who was or had been rather remarkable for her intellectual culture, is, assuredly, no evidence of fraud. Otherwise, anyone might be restrained in manifesting friendship for an aged and enfeebled person having property,

lest he should be charged with sinister designs. They had a right to do it, and the effect of their kindness is natural and in no way renders them obnoxious to the grave charge of fraud. It is true, the old lady had attained to a great age, and had the feebleness of body incidental thereto, but she read much, conversed intelligently upon the topics of the day, and had decided views of affairs. I do not think, on the whole, she was a person who could be easily influenced, and I find no evidence of any attempt to do it in the direction of testamentary dispositions. There are evidences of instances of eccentricities, scattered here and there over a period of ten years, which, when grouped together, seem somewhat formidable, but I apprehend there are few of us who may be now conceded to have abundant testamentary capacity, who, if our lives were rigidly scrutinized, during the same period of time, would not furnish as many. But it is useless to pursue the subject farther, since I find no attempt made to exercise any influence upon her in regard to her will, whatever her condition, in this respect, may have been.

I am also satisfied that, at the time the wills of 1874 and 1877 were executed, she possessed sufficient testamentary capacity. The very fact that she made the "mem. of my will," for the latter will, which was drawn in strict accordance therewith, is the strongest evidence of that fact. It shows that she carried in her mind the provisions of the next prior one, together with the important intermediary acts, and also the condition of her pecuniary matters. That she omitted the Whelpley children from its provisions, cannot be regarded as remarkable when it is shown that, for some cause, whether

just or not, she had no particular regard for them. Being of sound mind, her will stands as the reason for the act. The testimony of her attending physicians shows her competency. I agree with Surrogate BRADFORD, as to what he says, in Allen v. The Public Administrator (*supra*), in regard to the importance of such testimony. They saw, conversed with and observed her, and they give the facts and conclusions derived from them. It is, to my mind, much more satisfactory than the testimony of experts, based solely upon hypothetical questions. About three years subsequent to making the will of 1877, the old lady became palpably insane, laboring under very marked delusions, and it was not until she reached this stage, that the expert, Dr. Schmid, saw her. Able and skillful as he is, I am unwilling, from his inferences, as against the testimony of the attending physicians, to reach the conclusion that she was mentally unsound three years before. Dr. Nichols, the distinguished Superintendent of the Bloomingdale Asylum, to whose enlightened testimony I listened with great interest and pleasure, because of his thorough candor, large experience and perfect mastery of the subject, never saw the deceased. This witness failed, likewise, to impress my mind with a conviction of the mental incompetency of the testatrix in 1877. Had he been her attending physician at that time, and subsequently to the period of the manifestation of positive delusions, and had he then testified to her mental unsoundness throughout, giving the facts and the reasons, I should have felt bound to be guided by his mature judgment. As it is, I find that she was competent to make the will, and that it must be admitted to probate.

The proponent's counsel, at the close of his argument, insisted that Mr. Hitchings had not propounded the will of 1874 in good faith, and was not, therefore, under the provisions of subd. 3 of § 2558 of the Code, entitled to costs. Without entering upon the consideration of that question, I think he is not entitled to costs, on the simple ground that he is his own counsel. I have so held in a number of cases. He, as well as the other contestants, however, are entitled, under that section, as amended in 1881, to an allowance for what they have paid to the stenographer for a copy of his minutes of testimony; and the proponent alone is entitled to his costs to be taxed.

Decreed accordingly.